BROWN, C.J.
*1126 These consolidated cases[1] arise out of the Twenty-Sixth Judicial District Court, Bossier Parish. Plaintiff, Kimberly Reagan, appeals from a property partition judgment between herself and defendant, Melvin Reagan. For the following reasons we affirm in part, amend in part and as amended, affirm, and reverse and remand with instructions in part.
FACTS AND PROCEDURAL HISTORY
Plaintiff, Kimberly Reagan ("Kimberly"), and defendant, Melvin Howard Reagan ("Melvin"), were married on May 25, 2009, and physically separated on December 23, 2013. There were no children of the marriage. Kimberly filed a petition of divorce under La. C.C. art. 102 on January 3, 2014. A judgment of divorce was rendered on November 13, 2014, retroactively terminating the community of acquets and gains on January 3, 2014. Melvin died on June 30, 2015. Kimberly filed a petition to partition the community property on September 11, 2015. Mavis Reagan, the executrix of Melvin's Succession ("executrix"), was substituted for Melvin by an ex parte order signed on September 23, 2015.
During their marriage, the parties lived in Bossier Parish at a house at Hunters Hollow owned by Melvin prior to the marriage. Throughout the marriage, Melvin was the sole member of MHR Land Services, LLC, a business entity he formed before the marriage. This LLC was Melvin's main source of income. Kimberly was not employed during the marriage.
The partition proceedings ensued over several months and numerous court dates. The parties filed many Sworn Detailed Descriptive Lists and Traversals, along with a joint list of the contested and uncontested issues. A trial was held, and certain assets were auctioned. Kimberly took possession of the items she won. The court issued a partial judgment reflecting the same. The matter was continued and eventually reset for trial. On that date, and after a pretrial conference, the court decided that the parties should submit briefs to determine which items were community assets or obligations, with a written judgment to follow from the court. The trial court then filed a "Judgment With Reasons."[2] Kimberly appeals from that judgment and assigned the following errors on appeal:[3]
1. Item 17: Is the $325,000, Multiple Indebtedness Loan a separate obligation *1127 of Melvin's when incurred during the community, but in his name only and borrowed on his separate property for his benefit only?
2. Item 19: Is Kimberly entitled to a reimbursement claim for the use of community funds to pay off Melvin's premarital tax debt?
3. Items 24, 33, 34 and 39: Is the court required to offset Melvin's membership interest in First Eagle, LLC, a community asset, by awarding Kimberly an equalization claim in other community assets?
4. Items 23 and 40: Is the court required to offset Melvin's membership interest in MHR Holdings, LLC, a community asset, by awarding Kimberly an equalization claim in other community assets?
5. Item 41: Is Melvin required to account for the former community property in his possession on the termination date, resulting in Kimberly receiving an equalization claim for one-half of the funds held by Melvin in the Morgan Stanley Active Assets account?
6. Items 38, 44 and 45: Is the court able to place a value on the remaining furnishings, furniture, guns and other contents of the house and garages located at Hunters Hollow without any basis to support the valuation?
7. Item 46: Is Kimberly entitled to a reimbursement claim for the amount of community funds used for the benefit of Melvin's separate property?
8. Item 52: Is the property located at 6125 Bostwick Road a community or separate asset?
9. Item 56: Is there a reimbursement claim owed on the Bass Pro Credit Card Number 7889?
10. Item 68: Is Melvin entitled to a reimbursement claim for funds spent gambling by Kimberly when he not only allowed and consented to her activities, but gave her and paid off the credit cards each month?
11. Item 78: Is Kimberly entitled to seek a reimbursement claim on the uncompensated labor of a spouse for accounts receivables earned during the marriage, but received shortly after the termination of the community property regime?
12. Item 66: is Melvin entitled to a reimbursement claim on Lot 76, Kings Pointe Subdivision, Phase 2 for a mortgage that never existed?
The executrix answered the appeal and asked the trial court's judgment be modified as follows:
13. Item 67: Melvin shows that he should have been awarded a reimbursement claim against Kimberly in the amount of $6,545.00 for payments made from the community property for breast surgery for Kimberly.
14. Item 68: The District Court miscalculated the amount of the reimbursement due to Melvin for Kimberly's gambling debts. The correct amount should have been $12,056.50 instead of the District Court's award of $6,028.25.
DISCUSSION
A trial court has much discretion in valuing and allocating assets and liabilities in community property partitions and must consider the source and nature of each asset or liability, the financial situation of the other spouse and any other relevant circumstances. Maxwell v. Maxwell , 51,335 (La. App. 2d Cir. 4/5/17), 217 So.3d 1227, writ denied , *1128 17-0958 (La. 10/9/17), 227 So.3d 830. A trial court's factual findings and credibility determinations made in the course of valuing and allocating assets and liabilities in the partition of community property may not be set aside absent manifest error. Clemons v. Clemons , 42,129 (La. App. 2d Cir. 5/9/07), 960 So.2d 1068, writ denied , 07-1652 (La. 10/26/07), 966 So.2d 583.
1. Item 17: $325,000 Multiple Indebtedness Line of Credit
The trial court, in its reasons for judgment, found that the $325,000 line of credit secured by Melvin's separate property was a community obligation because the loan was established during the existence of the community. The court reduced the balance of the loan by $134,000, since that portion of the funds was used to buy a house for Kimberly. Kimberly was then debited $95,500, one-half of the net balance on the loan.
Kimberly argues that the Multiple Indebtedness Line of Credit should be classified as Melvin's separate obligation. She urges that it should be classified as such because the loan was secured by the home the two shared at 331 Hunters Hollow, which was purchased by Melvin prior to the marriage. Kimberly did not sign as a borrower on the line of credit, and she was unable to borrow on it. Kimberly also argues the debt was not for the common interest of the spouses because all but one of the withdrawals went to MHR Land Services, LLC ("MHR Land"), a limited liability company Melvin created prior to the marriage. Therefore, the loan was used to benefit Melvin's separate property.
The executrix argues that the loan was incurred during Melvin and Kimberly's marriage and should therefore be classified as a community obligation. MHR Land was the main source of income for the parties during the marriage, so the loan proceeds were used for the Reagans' living expenses. The executrix also asserts that $134,000 from the line of credit was used to purchase a home for Kimberly, which the trial court deducted from the loan balance, requiring Kimberly to reimburse the former community $95,500, half of the net balance on the loan.
An obligation incurred by a spouse may be either a community obligation or a separate obligation. La. C.C. art. 2359. An obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouse or for the interest of the other spouse is a community obligation. La. C.C. art. 2360. Except as provided in La. C.C. art. 2363, all obligations incurred by a spouse during the existence of the community property regime are presumed to be community obligations. La. C.C. art. 2361. According to La. C.C. art. 2363, a separate obligation of a spouse includes one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse. Once it is shown that a debt arose during the existence of the community, the presumption set forth in Article 2361 may be rebutted only by facts proving the indebtedness to be a separate obligation as defined in Article 2363. Nesbitt v. Nesbitt , 40,442 (La. App. 2d Cir. 1/13/06), 920 So.2d 326, writ denied , 06-0720 (La. 6/2/06), 929 So.2d 1255.
In her argument, Kimberly cites Maxwell, supra , in support of her argument that the loan was in Melvin's name only and was secured by his separate property, making it a separate obligation. The particular debt in Maxwell was one incurred by the husband prior to the marriage and secured by his separate property. The loan was later refinanced during the marriage and half of the property securing the loan was donated to the wife. However, the wife never specifically assumed the debt at issue *1129 in Maxwell . Therefore, the debt remained a separate obligation of the husband's. Id.
In this case, the debt was incurred during the marriage . Therefore, the presumption from La. C.C. art. 2361, that the loan is a community obligation, is applicable. It is irrelevant what property secured the loan. A significant portion of the loan went to MHR Land, which was the spouses' main source of income during the marriage. Hence, the debt, ultimately, was for the common interest of the spouses. Furthermore, a substantial portion of the loan ($134,000) went to buy Kimberly a new home, which shows that she benefitted from the obligation. Kimberly failed to assert facts showing that this obligation is Melvin's separate obligation. The trial court did not commit manifest error in the classification of this obligation as community.
2. Item 19: Kimberly's Reimbursement for Use of Community Funds to Pay Melvin's Premarital Tax Liability
In its reasons for judgment, the trial court found that the tax liability was Melvin's separate obligation since it existed prior to the marriage. The court noted that the check used to pay the liability had a high check number (# 7442), showing that the account it was drawn on was not new. The trial court also noted that the account was in Melvin's name and existed prior to the marriage. The court finally stated that there was no evidence the funds were community funds generated during the first ten days of the parties' marriage, and there was no evidence of commingling of community and separate funds in that account.
Kimberly argues that approximately ten days after the parties were married in May 2009, Melvin wrote a check in the amount of $26,273.46 to pay for his 2007 tax liability. Kimberly claims that Melvin used community funds to pay this liability and she is entitled to a reimbursement for one-half of the value the community property had at the time that it was used.
The executrix argues that the funds used to pay the liability were not community funds because the tax liability payment came from an account in Melvin's name that existed prior to the marriage. Also, the tax liability was paid just ten days after the parties were married, and there was no evidence presented to prove that the $26,273.46 was earned in those ten days.
If community property has been used during the existence of the community property regime ... to satisfy a separate obligation of a spouse, the other spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. La. C.C. art. 2364. Things in possession of a spouse during the existence of a regime are presumed to be community, but either spouse may prove that they are separate property. La. C.C. art. 2340. Separate property of a spouse comprises property acquired by a spouse prior to the marriage. La. C.C. art. 2341.
Melvin deposited money into his separate property Capital One checking account (6524) on June 5, 2009, in order to cover the check he wrote on June 4, 2009, to the U.S. Treasury for tax year 2007. The parties were married on May 25, 2009, so that deposit was made 11 days later. The evidence is sufficient to overcome the presumption that the funds used to pay the tax debt were community funds. The trial court did not commit manifest error in finding that the funds were community and therefore Kimberly did not have a reimbursement claim.
*1130 3. Items 24, 33, 34 and 39: Kimberly's Equalization Claim in the Community Asset, First Eagle, LLC
First Eagle Shreveport, LLC ("First Eagle"), was a limited liability company created during the existence of the marriage, and the parties agree that the LLC is community property. Melvin was the sole member and manager of the LLC. First Eagle was created to purchase an airplane and hangar for Melvin's use; the purchases occurred in October 2013. Melvin sold the airplane and hangar in March 2014 after the community property regime terminated. The plane was sold for $425,000; and the hangar was sold for $325,000. The parties allege outstanding debt on each, respectively, was $317,013.61 and $201,738.29. What remains is $231,248.10, the amount the plane and hangar were sold for less the debt on both. Additionally, First Eagle held a Citizens National Bank account which had a balance of $21,209.11 at the termination of marriage. The trial court, in its reasons for judgment, found that First Eagle was a community asset and assigned a 50% interest in the LLC to each party.
The trial court stated that the plane, hangar and Citizens National Bank account for First Eagle were assets of First Eagle and were encompassed in Kimberly's 50% interest in the LLC. The trial court stated that no reimbursement claims survived and assigned $0 due to Kimberly for the plane, hangar, bank account, and LLC interest.
Kimberly argues that the trial court erred in assigning her a 50% interest in First Eagle instead of dividing up the assets left in the LLC. Since Melvin, the sole member and manager, died, the LLC is now "nonexistent." Therefore, the assets should be divided between the parties. Kimberly seeks one-half of the remaining assets in First Eagle, $115,624.05, either through an equalization claim, or through reimbursement.
The executrix argues that community assets are valued at the time of trial. The airplane and hangar were sold and the bank account closed, so there is no reason to remand this issue to the trial court to determine the assets of a defunct LLC.
After termination of the community property regime, the provisions governing co-ownership apply to former community property, unless otherwise provided by law or by juridical act. When the community property regime terminates for a cause other than death or judgment of declaration of death of a spouse, the community property articles regarding co-ownership between the former spouses[4] apply to former community property until a partition. La. C.C. art. 2369.1. Each spouse owns an undivided one-half interest in former community property and its fruits and products. La. C.C. art. 2369.2.
A spouse has a duty to preserve and to manage prudently former community property under his control in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect. La. C.C. art. 2369.3.[5]
*1131 This article imposes a higher standard of care in managing and maintaining former community property than the standard imposed during marriage. Ellington v. Ellington , 36,943 (La. App. 2d Cir. 3/18/03), 842 So.2d 1160, writ denied , 03-1092 (La. 6/27/03), 847 So.2d 1269. The reason for the higher standard of care is that, after termination of the community property regime, the presumption that a spouse will act in the best interest of the community no longer exists. Id.
The spouse alleging improper management bears the burden of proving that her former spouse failed to manage and prudently preserve the former community property prior to partition. Comment (c) to La. C.C. art. 2369.3 provides that a spouse who asserts a claim under this article is required to prove that the other spouse failed to act prudently in a manner consistent with the mode of use of the property under his control immediately prior to termination of the regime, not simply that he had former community property under his control. The spouse who has control over former community property is in a position similar to that of a usufructuary and owes a high standard of care, that of a prudent administrator, in managing and preserving former community assets. Bad faith is not required under article 2369.3 because the spouse is "answerable for any damage caused by his fault, default or neglect." Ellington, supra.
In the instant case, at the time of termination of the community property regime, First Eagle had assets (the plane, hangar and funds in the Citizens National Bank account) and debts (the notes on the plane and hangar). Both parties allege that within a few months of the regime's termination, Melvin sold the plane and hangar. In her post-trial brief and in her brief to this Court, the executrix claims that the assets of the community were valued as of the time of trial and at that time, First Eagle had no value. Nowhere in the record does the executrix account for the proceeds from the alleged sale of the plane and hangar and the funds in First Eagle's Citizens National Bank account. The executrix's exhibits show that the note on the plane and hangar were paid through 2014, and the parties allege that the notes on both were eventually paid off.
Melvin had a duty to preserve the former community assets after the termination of the regime. First Eagle was a former community asset that he had a duty to preserve. While selling the plane and hangar and paying the debts on both may have been the actions of a prudent administrator, removing the sale proceeds, closing the Citizens National Bank account and making the LLC worthless were not. See Brown v. Brown , 28,441 (La. App. 2d Cir. 8/21/96), 680 So.2d 1203, writ denied , 96-2562 (La. 12/6/96), 684 So.2d 940 ; Granger v. Granger , 06-1615 (La. App. 3d Cir. 9/26/07), 967 So.2d 540, writ denied , 07-2436 (La. 2/15/08), 976 So.2d 181 ; Queenan v. Queenan , 492 So.2d 902 (La. App. 3d Cir. 1986), writ denied , 496 So.2d 1045 (La. 1986). In this case, the trial court committed manifest error in its valuation of First Eagle and in its failure to require the executrix to account for First Eagle's assets and liabilities as of the time of termination of the regime.
In allocating community assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court must consider the nature and source of the asset or liability, the economic condition of each spouse and any other circumstances the court deems relevant. La. R.S. 9:2801(A)(4)(c) ; Ellington , supra . The court is required to divide the community assets and liabilities so that each spouse receives property of an equal net value.
*1132 La. R.S. 9:2801(A)(4)(b) ; Robinson v. Robinson , 99-3097 (La. 1/17/01), 778 So.2d 1105. In order to avoid an unequal net distribution of assets and liabilities, the court may order the payment of an equalizing sum of money. La. R.S. 9:2801(A)(4)(d).
Assignment of a 50% ownership interest of First Eagle to each party in this matter would only ensure future litigation between the parties. "There are good and practical reasons why the community should be divided with finality.... [W]hen the trial court requires co-ownership over the objection of one of the spouses, future disputes are not only likely, they are a certainty, and this means future litigation." Stewart v. Stewart , 585 So.2d 1250, 1254 (La. App. 4th Cir. 1991), writ denied , 590 So.2d 594 (La. 1992). The community property should be partitioned with as much finality as possible in this case.
Kimberly, in her traversals, valued the plane and hangar at the price for which they were allegedly sold, $425,000 and $325,000, respectively. This Court reverses this part of the trial court judgment and remands it to the trial court to allocate 100% of the ownership interest in First Eagle to Melvin's estate, and credit Kimberly with an equalizing payment reflecting her undivided one-half interest in First Eagle. The trial court is to value First Eagle at the amount the plane and hangar were sold for less the outstanding debt at the termination of the marriage, plus the amount in the First Eagle Citizens National Bank account at the termination of the regime. Kimberly is to be credited with an equalization payment for one-half of that amount.
4. Items 23 and 40: Kimberly's Equalization Claim in the Community Asset, MHR Holdings, LLC
MHR Holdings, LLC ("MHR Holdings"), was a limited liability company created during the existence of the marriage, and the parties agree that it is community property. Melvin was the sole member and manager of the LLC. MHR Holdings held a Capital One bank account as an asset at the termination of the marriage. The account balance as of December 31, 2013, three days prior to the termination of the regime, was $1,698.80. The Capital One account is the only LLC asset at issue. The trial court ruled that MHR Holdings was a community asset and assigned 50% ownership interests to Melvin's estate and Kimberly. The court said there was no claim to any asset or debt independent of the ownership interest in MHR Holdings.
Kimberly argues that the trial court's ruling does not partition the community interest, and that, because Melvin was the sole member and manager of the LLC, her interest in MHR Holdings is worthless. Kimberly asks that this case be remanded to the trial court to have 100% of the LLC assigned to Melvin's estate, and for her to receive an amount equal to one-half of the community assets and reimbursement claims associated with the use or distribution of community funds.
The executrix argues that Kimberly is not entitled to an equalizing distribution of other community assets to offset Melvin's interest in a now-defunct LLC. Kimberly submitted evidence that the Capital One account had a balance of $1,698.80 at termination of the community, and it would be useless to remand the case for such a small amount. Additionally, the executrix argues that the trial court values an LLC at the date of the trial, and not at the termination of the community.
The issue here is similar to the previous issue regarding First Eagle. Therefore, we reverse this part of the trial court's judgment and remand to the trial court with instructions that 100% of the membership interest in MHR Holdings is to be assigned *1133 to Melvin's estate, and Kimberly is to receive an equalizing payment of one-half the value the LLC had at the termination of the regime, $849.40.
5. Item 41: Kimberly's Equalization Claim for One-Half the Funds Held in the Morgan Stanley Active Assets Account
The trial court ruled that the Morgan Stanley Active Assets account ("Morgan Stanley account") is controlled by federal law, and any withdrawals from the account deposited in Melvin's separate property LLC, MHR Land, would have resulted in community income, since Melvin drew his income from MHR Land. The parties benefitted from this income during the regime. The court stated that there was no reimbursement claim for this asset, and assigned $0 due to Kimberly. The trial court did not address whether Kimberly had an equalization claim for the funds in the account at the termination of the marriage.
Kimberly argues that she is entitled to one-half of the assets in the Morgan Stanley account at the termination of the marriage. The account balance at the termination of the community was $49,770.67. Kimberly states that she is entitled to those funds because the Morgan Stanley account was created during the marriage and is, therefore, a community asset. Kimberly does not claim that she is a designated beneficiary of the account.
The executrix argues that Kimberly is not entitled to an equalization claim because the account is controlled by federal law,[6] and any proceeds from the account go to the designated beneficiaries.
Melvin opened the Morgan Stanley account in 2012 during the regime. The parties in their briefs and in the record refer to the Morgan Stanley account as a retirement account, and the trial court found that federal law was controlling with regard to this account. Generally, federal law preempts state law regarding who is entitled to the assets in a retirement account. See Boggs v. Boggs , 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed. 2d. 45 (1997). However, Boggs is inapplicable here, because the community terminated prior to Melvin's death, and Kimberly is seeking an equalizing payment and not an ownership interest in distributions from the Morgan Stanley account.
Louisiana Revised Statute 9:2801.1 states in pertinent part
When federal law or the provisions of a statutory pension or retirement plan, state or federal, preempt or preclude community classification of property that would have been classified as community property under the principles of the Civil Code, the spouse of the person entitled to such property shall be allocated or assigned the ownership of community property equal in value to such property prior to the division of the rest of the community property.
The Morgan Stanley account was created during the community and would be classified as community property if not for federal law preempting such a classification. This Court reverses this part of the trial court's judgment and remands to the trial court to credit Kimberly with a payment equal to one-half of the value of the Morgan Stanley account at the termination of the community regime.
6. Items 38, 44 and 45: The Court's Valuation on the Remaining Furnishings, Furniture, Guns and Other Contents of the House and Garage Located at Hunters Hollow
The trial court, in its reasons for judgment, described as "rather convoluted"
*1134 the classification of the remaining property at Hunters Hollow, Melvin's separate property that served as the family home, as separate or community. The court valued the remaining contents of the house at $5,000 and reimbursed Kimberly for one-half of this amount ($2,500). The court stated that the guns, bows and arrows purchased during the marriage were community assets, and the court valued them at $500, reimbursing Kimberly for one-half of this amount ($250).
Kimberly argues that it is unclear what movables remain in the Hunters Hollow house. An appraisal was performed, but Kimberly argues that the executrix refused to pay the bill for the appraisal out of the estate, and, therefore, the inventory was not presented to the court. Kimberly asserts that the trial court had no basis for arriving at the $5,000 figure and asks that this issue be remanded to the trial court with instructions that each party submit an appraisal of the household furnishings to the court in order to determine the value of the community property.
The executrix argues that most of the movable property in the house was Melvin's separate property because it was purchased before the marriage. The executrix produced documents from Ashley's Furniture providing the dates as to when much of the furniture in the house was purchased.
In community property partitions, the trial court is granted much discretion in valuing and allocating assets. La. R.S. 9:2801 et seq. ; Ball v. Ball , 32,851 (La. App. 2d Cir. 3/1/00), 757 So.2d 824. Given this great discretion, the trial court is not required to accept at face value a spouse's valuation of assets or debts, or claims against the community. Id. Kimberly and the executrix submitted invoices from Ashley Furniture for the furnishings at the Hunters Hollow home. The purchase date on most of those invoices is prior to the marriage. Kimberly asserts that most of the furnishings were picked out before the marriage and paid for during the marriage; therefore most of the furnishings are community.
The law classifies property that one spouse acquired prior to marriage as that spouse's separate property. La. C.C. art. 2341. It is clear from the invoices presented to the trial court that much of the Hunters Hollow movable property was acquired by Melvin prior to his marriage to Kimberly, making it Melvin's separate property. We find that the trial court did not abuse its discretion in its valuation of the community furnishings, guns, etc., that remained at the Hunters Hollow home.
7. Item 46: Kimberly's Reimbursement Claim for Community Funds Used for the Benefit of Melvin's Separate Property, the Spouses' Home at Hunters Hollow
Certain improvements were made to the spouses' home, such as construction of a free-standing garage, replacement of fixtures, installation of a new theater/media system, purchase of a generator, purchase and installation of an awning, pouring of concrete, and extensive landscaping. The trial court said that the improvements enhanced the value of Melvin's separate property by $25,000 and assigned a credit to Kimberly of $12,500.
Kimberly argues that the trial court misapplied the law in this case and should have reimbursed her for the value the community property had at the time that it was used.
The executrix argues that any repairs made to the spouses' matrimonial home were done so in order to maintain the habitability and upkeep of the home, and the trial court did not err in arriving at the $25,000 figure.
*1135 This issue is governed by La. C.C. art. 2366, which states:
If community property has been used during the existence of the community property regime or former community property has been used thereafter for the acquisition, use, improvement, or benefit of the separate property of a spouse, the other spouse is entitled to reimbursement for one-half of the amount or value that the community property had at the time it was used.
Buildings, other constructions permanently attached to the ground, and plantings made on the separate property of a spouse with community property belong to the owner of the ground. The other spouse is entitled to reimbursement for one-half of the amount or value that the community property had at the time it was used.
It appears that the trial court misapplied the law in this case. Any reimbursement for improvements made to Melvin's separate property should have been based on the value that the community property had at the time that it was used, not on the enhanced value to the separate property. Therefore, the trial court erred in its valuation.
Kimberly provided documentation in the form of multiple checks paid to various contractors and suppliers for improvements made to the Hunters Hollow home. Kimberly's pretrial brief shows the total of those expenses as $171,714.11. Kimberly, in her brief to this Court, has the figure at $169,107.75, with her undivided one-half interest being $84,553.87. Since Kimberly is asking for the lesser of the two figures, the Court will use that sum. We reverse this part of the trial court's judgment and remand to the trial court with instructions to credit Kimberly $84,553.87.
8. Item # 52: Is the Property Located at 6125 Bostwick Road a Community or Separate Asset?
In 2012, Melvin wrote two checks to John Shipley in the amounts of $142,000 and $68,000. The checks were dated February 2, 2012, and March 5, 2012, respectively. The checks were written on the MHR Land account. Both parties agree that the checks represented a loan MHR Land made to Mr. Shipley. On February 15, 2012, Mr. Shipley and his wife signed an agreement stating that, for the consideration of $210,000, and should either Mr. Shipley or his wife become deceased, the surviving spouse agreed to sell their home at 6125 Bostwick Road and pay Melvin 100% of the equity from the sale. The document was witnessed and notarized, and was filed with Caddo Parish Clerk of Court on May 8, 2012 under the registry number 2400972.
In September 2012, the Shipleys and Melvin signed an "Act of Conveyance" which stated that the Shipleys conveyed to MHR Land their immovable property at 6125 Bostwick Road. The Act of Conveyance stated that:
This sale is made for the consideration of an acknowledgment by [Melvin] Reagan...that the condition stated in that certain document recorded May 8, 2012, under Registry Number 2400972 in the Conveyance Records of Caddo Parish, Louisiana, has been fulfilled and ... Melvin Reagan hereby waives any rights reserved in said document.
The document was signed by the Shipleys, witnessed and notarized on September 20, 2012. The document was signed by Melvin as a member and manager of MHR Land, and also by Melvin "Individually," and was witnessed and notarized on September 19, 2012.
The trial court stated that the property at 6125 Bostwick Road related to a *1136 $210,000 loan made from MHR Land, Melvin's separate property, to a third party, the Shipleys. The court further found that the May 8, 2012, document was irrelevant because the death of either Mr. or Mrs. Shipley did not occur, and the subsequent conveyance of the Bostwick property from the Shipleys to MHR Land was the equivalent of a dation en paiement. The court found that the loan made by MHR Land was the separate property of Melvin's, and the resolution of the debt did not create a right of reimbursement in favor of Kimberly.
Kimberly argues that Melvin commingled the funds going into and coming out of MHR Land, and the legal document requires that 6125 Bostwick Road be transferred to Melvin and not MHR Land. Kimberly seeks an equalization claim for $105,000.
The executrix argues that the suspensive condition in the May 8, 2012, document did not occur, and the act of conveyance waived any right of Melvin's to that transfer. This is a matter of MHR Land loaning money to a third party, and the third party dationing immovable property to MHR Land to satisfy the debt.
It is clear from the evidence the parties presented in this case that MHR Land made a loan to the Shipleys, and the Shipleys paid back the loan via a dation en paiement of the Bostwick Road property. Since MHR Land is Melvin's separate property, the Bostwick Road property is an asset of MHR Land, and not community property. The trial court did not err in finding that Kimberly had no reimbursement claim as to this property.
9. Item 56: Reimbursement Claim for the Bass Pro Credit Card Number 7889
It appears from the executrix's post-trial brief that she waived her claim for reimbursement for Bank of America Bass Pro Credit Card 7889 ("card 7889"), but sought a reimbursement claim instead for Bank of America Bass Pro Credit Card 6056 ("card 6056"). The executrix listed card 6056 as a community liability when she filed her second supplemental and amending sworn detailed descriptive list of Melvin's community property. The trial court in its reasons for judgment found that the reimbursement claim for card 7889 was converted to a claim for card 6056, which had a balance of $7,569.40 at the termination of the regime. The court assigned a $3,784.70 debit to Kimberly for one-half of that amount.
Kimberly seeks to have the claim denied, urging that the executrix waived the claim for card 7889.
The executrix argues that the trial court did not err or abuse its discretion in its finding.
The executrix provided a statement from December 2013 for card 6056. All the purchases listed on the card occurred prior to December 5, 2013, before the community property regime terminated on January 3, 2014. Since the debts were incurred during the regime, they are community obligations. The trial court did not err in assessing one-half of this community obligation to Kimberly.
10. Item 68: Reimbursement for Kimberly's Gambling Debt and Valuation of the Debt
The trial court found that Kimberly's gambling debts were not expenses for the joint benefit of the community. The trial court stated that Kimberly owed reimbursement for one-half of the depreciation of the community estate in the form of gambling losses of $12,056.50, and the court assigned Kimberly a debit of $6,028.25, which is one-half of that amount.
*1137 Kimberly argues that Melvin consented to her gambling and paid her gambling bills every month, and the trial court erred in finding that she owed reimbursement.
The executrix argues that the community funds Kimberly spent on gambling were not for the interest of the spouses. The executrix further claims that the amount Kimberly actually spent on gambling was $24,113, and Kimberly should have been assigned a $12,056.50 debit. The executrix seeks to have Kimberly debited an additional $6,028.25.
Obligations incurred by a spouse during the community regime are presumed to be community. La. C.C. art. 2361. In Biondo v. Biondo , 99-0890 (La. App. 1st Cir. 7/31/00), 769 So.2d 94, the First Circuit found that the loans obtained for the husband's gambling were community obligations. The wife accompanied her husband on several of his gambling trips, showing she had knowledge of and consented to his using the borrowed money for the purposes of gambling. Id.
In the instant case, the executrix provided credit card statements with gambling charges on them from November 2012 to December 2013. The executrix provided credit card statements for card 1811 (formerly card 0052), card 4062, and card 6056 (formerly card 9404). The record shows that cards 1811 and 6056 were in Melvin's name. Kimberly claims that Melvin was aware of her gambling and paid the credit card statements every month, and several statements show that the balance from the prior statement was paid in full. Additionally, the couple incurred significant debts on the accounts, with the monthly balances on those cards often running into the thousands of dollars; however, the total yearly interest accrued on the cards remained low each month. This supports Kimberly's uncontested claim that Melvin paid the credit card bills every month and was aware of the gambling charges on them.
The executrix cites Sequeira v. Sequeira , 04-433 (La. App. 5th Cir. 11/30/04), 888 So.2d 1097, writ denied , 05-0350 (La. 4/29/05), 901 So.2d 1065, in support of her argument. The debt at issue in Sequeira was for the husband's LASIK surgery and was incurred two weeks prior to the termination of the marriage. Id. In this case, the executrix is claiming reimbursement for multiple gambling charges occurring over a period of more than a year, all of which Melvin would have been aware of and paid off with every credit card statement that he received. These debts were extinguished. The parties agreed that the remaining debts on cards 1811 and 6056 were community obligations divided between the parties, and the executrix waived a claim to reimbursement for card 4062.
Melvin consented to his former wife's gambling as evidenced by his payment of Kimberly's monthly gambling debts. The trial court erred in debiting Kimberly $6,028.25 as the community has no reimbursement claim, so this part of the judgment is reversed.
11. Item 78: Kimberly's Reimbursement Claim for Melvin's Uncompensated Labor Performed Before Termination of the Community
Melvin's separate property LLC, MHR Land, received approximately $800,000 from BHP Billiton ("BHP") after the community terminated for work performed by MHR Land in 2013. The trial court found that the BHP payments were not disbursed or distributed to Melvin during the existence of the community, and, therefore, the funds were not subject to a reimbursement claim. The trial court denied Kimberly's reimbursement claim.
*1138 Kimberly asks this Court to reverse and remand on this issue so the trial court can properly assess her claim for reimbursement.
The executrix argues that Melvin was compensated for his labor during the community as the sole member and manager of MHR Land. Additionally, there is no evidence that MHR Land increased in value as a result of the post-termination payments received. Therefore, the trial court's finding on this issue should be affirmed.
If the separate property of a spouse has increased in value as a result of the uncompensated common labor or industry of the spouses, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor. La. C.C. art 2368.
Kimberly supplied pre-termination billing statements MHR Land sent to BHP and post-termination bank records showing compensation received from BHP. Melvin was the sole member and manager of MHR Land, and drew his income from the LLC. He would have received income from MHR Land for the time between when BHP was billed and when the marriage terminated. Therefore, he was not uncompensated for his labor. This assignment of error lacks merit. We affirm in part.
12. Item 66: Is Melvin Entitled to a Reimbursement Claim on Lot 76, Kings Pointe Subdivision, Phase 2
The trial court stated that Melvin was entitled to reimbursement for one-half of the community property used to pay Kimberly's mortgage on her separate property at "Lot 76 Kings Pointe." The court debited Kimberly $9,674.74.
Kimberly argues that Kings Pointe house was purchased for her shortly before the marriage terminated, and the house was paid for in full at the time of purchase. Kimberly claims that there has never been a mortgage on the Kings Pointe house.
The executrix argues that the reimbursement is for the community funds used for mortgage payments on Kimberly's separate property house located at 4507 Steere Drive. The executrix claims that the immovable property related to this reimbursement claim was misidentified in several documents filed by the parties with the trial court, but that Kimberly acknowledged the mortgage payments on the Steere Drive house in her bench book.
Both parties agreed that Melvin should be reimbursed for the principal mortgage payments made on Kimberly's separate property at Steere Drive. While the immovable property was misidentified in certain court filings, the reimbursement claim for the mortgage payments on Kimberly's home appears only once in the trial court's reasons for judgment, and is misidentified as being for the King's Pointe property instead of the Steere Drive home. The parties, in their filings, do not dispute the amount, so we will amend the judgment to reflect that this reimbursement claim is for mortgage payments made on Kimberly's Steere Drive property.
13. Item 67: Reimbursement for Kimberly's Plastic Surgery
In April 2011, Kimberly had breast augmentation and stomach reduction surgery. The total fees related to the surgery amounted to $13,090. The trial court denied the executrix's claim for reimbursement for one-half of that amount ($6,545), but the court did not give reasons for its judgment.
The executrix seeks reimbursement of $6,545 for Kimberly's plastic surgery.
*1139 Kimberly argues that Melvin consented to her surgeries and asks that the reimbursement claim be denied.
Obligations incurred during the community are presumed to be community obligations. La. C.C. art. 2361. Therefore, the charges for the plastic surgery are presumed to be community obligations. Kimberly argues that Melvin consented to her plastic surgery. The executrix offered only the doctor's bills related to Kimberly's plastic surgery and no other evidence to show that the plastic surgery was not for the common interest of the spouses. The surgeries occurred in April 2011, more than two and one-half years prior to the termination of the regime. The surgeries were paid for in advance, and there was no evidence presented to overcome the presumption of a community obligation. See Ursin v. Ursin , 09-1630 (La. App. 1st Cir. 5/7/10), 2010 WL 1838407, writ denied , 10-1956 (La. 11/5/10), 50 So.3d 806. The trial court did not err in denying this claim for reimbursement.
Because of the issues and values to be determined by the trial court upon remand of this matter, that portion of the trial court's judgment providing that "Kimberly owes Melvin's estate reimbursement of $12,500" is hereby reversed. The amount of Kimberly's reimbursement claim will be recalculated by the trial court following its reconsideration and reevaluation of Items 23, 24, 33, 34, 39, 40, 41, 46, and 68.
CONCLUSION
For the reasons set forth above, and more specifically as indicated in Appendix "A", we affirm in part, amend in part, and as amended, affirm, and reverse and remand with instructions in part. Costs are assessed to Defendant.
Attachment *1140 APPENDIX "A"
KIMBERLY ANN REAGAN SUIT: 143,502 VERSUS 26TH JUDICIAL DISTRICT COURT MELVIN HOWARD REAGAN BOSSIER PARISH, LOUISIANA
JUDGMENT WITH REASONS
This community property partition and reimbursement matter arises from the relatively brief marriage between Kimberly Ann Reagan ("Kimberly ") and Melvin Howard Reagan, who is represented herein by his duly appointed Administratix ("Melvin "). The parties were married May 25, 2009 and separated a little over 4 years later on December 23, 2013. Melvin died on June 30, 2015 and his duly appointed and confirmed Administratrix was substituted in this proceeding. The succession proceeding of Melvin (Probate 19639) has been transferred to this Section of the 26th Judicial District Court. The current matter addresses only the classification of property as either separate or community property. The assertions of Kimberly that separate assets may be used to satisfy any deficiency resulting from the partitioning of community assets and reimbursement claims will be more fully addressed in the succession proceeding.
Based upon the law and evidence the Court makes the following ruling, using as a matter of convenience for all counsel the numbering system utilized by plaintiff and defendant in briefing:
Item Description Due Kimberly 1-6 MHR Land Services, LLC; Office furniture from 400 Travis Street; 331 0.00 Hunter's Hollow; Property at Grimmet Drive; Jackson/Franklin Parish Property; ownership interest in Good Time Billiards; and the Glenn Eagle House are the separate property of Melvin. No reimbursement owed for these items. 7 The Glenn Eagle House is the separate property of Melvin. There were $17,713.69 necessary expenses associated with owning and living in the residence which the parties both enjoyed. Those expenses are not recoverable by Kimberly. She is entitled to reimbursement in the amount of one-half of the reduction in the principal balance of the mortgage for payments made with community funds. Payments which resulted in the reduction of the principal balance during the marriage were $11,944.80 and the final payoff of $23,482.58 which total $35,427.38, to which Kimberly is entitled to recover one-half of that amount. 8 The Steere Drive property is the separate property of Kimberly, and just as ($885.43) above, any maintenance expenses are not recoverable by Melvin, but he is *1141 entitled to reimbursement from community funds of one-half of the reduction in the principal balance of the mortgage which was a separate debt. The total principal reduction of $1,770.86 results in a reimbursement owed to Kimberly of $885.43 9-15 Loans from Melvin's separate funds (MHR Services, LLC) to MHR 0.00 employees Harley, Jennye and John Shipley are not recoverable by Kimberly in the form of reimbursement. The same applies to loans to Ronald Kevin Reagan, Ricky L. Reagan, and Bill Reagan. The Court rejects the argument there was such a comingling of assets of Melvin and MHR Land Services, LLC so that they should be considered one in the same and therefore community assets. 16 The claim against JCS Enterprises is Melvin's separate property. 0.00 17 $325,000 line of credit secured by Hunter's Hollow property was a loan ($95,500.00) Affirmed established during the existence of the marriage and would therefore be a community debt. As it appears to the satisfaction of the Court that a portion of those funds ($134,000) was used to acquire a residence for Kimberly the debt for which was addressed in a side agreement. As such the balance of $325,000 is reduced by $134,000 and Kimberly owes reimbursement for $95,500 which is one-half of the net balance of $191,000 on this line item. The home is addressed separately and Kimberly should not be charged that the amount twice. 18 The mortgage for 331 Hunter's Hollow property was a debt created 140,000.00 immediately prior to the marriage of Melvin and Kimberly and therefore despite living in the residence Kimberly is entitled to be reimbursed for one-half of the principal balance of the separate debt which was paid with community funds. There was $280,000 in total principal reduction paid with community funds and as such Kimberly is entitled to receive $140,000 19 The tax liability incurred by Melvin prior to the marriage is his separate 0.00 Affirmed debt. Had community funds been used to pay that obligation Kimberly would be entitled to be reimbursed for one-half of such payments. Here, however, Melvin and Kimberly only married on May 25, 2009 and the payment was made on June 4, 2009. It is notable that the payment came in the form of check 7442 (obviously not a new account) and from an account bearing only Melvin's name which existed prior to the marriage. There is no evidence the funds in that account were community funds generated in the 20 days of marriage of the parties and there is no evidence the separate funds on deposit in that account prior to the marriage were commingled with any community funds. As such, Kimberly is not entitled to reimbursement of this payment. 20-22 The tax liabilities which arose during the marriage of the parties are debts 0.00 arising from community assets in the form of income. Those debts are appropriately paid from community assets. Kimberly is not entitled to reimbursement of any of those payments. 23 MHR Holdings, LLC is a community asset. Kimberly and Melvin are 0.00 Reversed & entitled to ownership interests in that entity. No reimbursement claims Remanded survive. Fifty (50%) percent ownership belongs to each party. 24 First Eagle, LLC is a community asset. Kimberly and Melvin are entitled to 0.00 Reversed & ownership interests in that entity. No reimbursement claims survive. Fifty Remanded *1142 (50%) percent ownership belongs to each party. 25-31 These community assets have been addressed by previous orders of the ($57,240.95) court and Kimberly owes an accounting for reimbursement of Melvin's interest in the Chevrolet Avalanche, Honda ATV and Trailer, 2011 Triton Boat, and assorted furniture (See 11/10/16 Judgment), in the amount of $57,240.95. 32 Kubota Tractor was purchased with the separate funds of Melvin and is not 0.00 a part of the community. (The tractor was subsequently donated as a manual gift) 33 It is uncontroverted the Beechcraft airplane was purchased by First Eagle, 0.00 Reversed & LLC, which was a limited liability company established during the Remanded community property regime. This is an asset of a limited liability company, the ownership of which was addressed in Item 24 above. Kimberly and Melvin own the entity and the entity owned the airplane so there is no additional reimbursement claim in favor of Kimberly 34 The Airport Hanger It is uncontroverted the Beechcraft airplane was Reversed & purchased by First Eagle, LLC, which was a limited liability company Remanded established during the community property regime. This is an asset of a limited liability company, the ownership of which was addressed in Item 24 above. Kimberly and Melvin own the entity and the entity owned the airplane so there is no additional reimbursement claim in favor of Kimberly 35 The 2011 Ford F-250 was a community asset. It was acquired in part by 9,021.75 Melvin trading in $9,000 worth of separate property. When Melvin traded in the community asset that created the right Kimberly to be reimbursed for one-half of the net value of the vehicle. That amount of the trade-in value assigned to the vehicle is disputed and represented to be $33,500 by Melvin and to be $37,500 by Kimberly. Exhibit I of Kimberly reflects the value allocated to vehicle to be $37,500. That figure, less the $9,000 separate property contribution by Melvin in the form of a trade-in, results in a value of $28,500. There were payments made using the separate funds of Melvin towards the community debt of $20,913 in principal balance after the termination of the community. Melvin's Executrix has asserted a claim for one-half of that debt paid from separate funds, or $10,456.50. Subtracting the $10,456.50 from the $28,500 value of the vehicle results in a net value of $18,043.50, to which Kimberly is entitled to one-half being $9,021.75 36 The 2011 Chevy Suburban is a community asset. It was assigned a value 8,391.3 of $38,000 when it was traded in during the marriage, entitling Kimberly to a claim of one-half of the equity in the vehicle. In addition to the $38,000 value there also remained $21,217.40 in debt, which resulted in a net value of $16,782.60. Kimberly is entitled to be reimbursed one-half of that value being $8,391.30 37 The advance payment to Bewley's Furniture is at controversy because 1,250.00 neither party can establish who received what property as a result of that purchase which occurred eight days before the parties separated. Kimberly has provided the court with evidence in the form of a delivery ticket reflecting the furniture was to be delivered to 1520 Airport Drive (the Hanger). It is unsigned and the date of delivery cannot be established from this document. However, under the circumstances the Court is satisfied the advance payment occurred during the marriage and the furniture was to be *1143 delivered to the Airport Hanger and not the residence used by Kimberly after she and Melvin separated. As such, she is entitled to reimbursement of one-half of those funds, or $1,250. 38 The issue of what furniture remains in the Hunters Hollow home and what 2,500.00 Affirmed furniture Kimberly has and what is separate (of Kimberly or Melvin) or community is convoluted at best. The value of the Hunter Hollow community property moveables and any and all other moveables not specifically dealt with previously or detailed herein is hereby established by the Court to be $5,000 to which Kimberly is entitled to be reimbursed $2,500. 39 The Citizen's National Bank account for First Eagle is similar to any other 0.00 Reversed & asset owned by limited liability company in which the parties had an Remanded ownership interest. Any claims to assets of the entity are necessary encompassed in the ownership of an interest in the entity. First Eagle, LLC is a community asset and Kimberly and Melvin each own a 50% interest in that entity. There is no reimbursement claim or offset allocated for any particular asset or debt of the entity. 40 The Capital One account for MHR Holdings, LLC is an asset owned by 0.00 Reversed & entity which was created during the marriage and in which Melvin and Remanded Kimberly share equal ownership interests. There is no claim for any asset or debt independent of the ownership in the entity. 41 The Morgan Stanley Active Assets account is controlled by federal law. 0.00 Reversed & Any withdrawals from this community asset which were then deposited in Remanded MHR Land Services, LLC would have necessarily resulted in the income produced at the time for the parties by MHR Land Services, LLC which would have been community income. The parties benefited from that income at the time. There is no reimbursement claim for this asset. 42 The Morgan Stanley Retirement Accounts were opened during the $97,555.81 community regime and Melvin is correct in asserting that federal law controls payment to the beneficiary, Kimberly is likewise correct in asserting her claim for reimbursement of one-half of the community funds deposited in Melvin's retirement account. Kimberly's reimbursement claim is offset by the funds withdrawn during the marriage and deposited in MHR Land Services, LLC because the resulting income was community income which she enjoyed. Kimberly is entitled to reimbursement of one-half of the community funds deposited in the Morgan Stanley Retirement Accounts less one-half of the sum of any funds withdrawn and deposited in any account which would have been a community account. The total contributions of community assets to these accounts is $195,111.63 to which Kimberly is entitled to reimbursement of one-half or $97,555.81 43 The movables at 143 Pallsade are not in dispute 0.00 44 The guns and bows and arrows purchased during the marriage are 250.00 Affirmed community assets and are comprised of a 2009 Remington model 870 12 gauge and a 2009 Winchester 30/30, with a combined value of $500.00. Kimberly is entitled to reimbursement of one-half of that value (or possession of the guns and modification of the amount accordingly). 45 The contents of the house and garage at Hunters Hollow is encompassed in 0.00 Affirmed item 38 above. *1144 46 The funds in the Capital One bank account in the name of Melvin were 12,500.00 Reversed & used for maintenance and upkeep of the home in which Kimberly and Remanded Melvin resided during the marriage. Kimberly is entitled to recover one-half of the increase in value of the separate property of Melvin which resulted from use of community funds. There are no valuations of the property before and after the marriage to follow the expenses asserted by Kimberly to be recoverable. The Court hereby fixes the value of the improvements (free standing garage, replacement of fixtures, theatre/media system, generator, awning and concrete) and therefore enhancement of the separate property of Melvin to be $25,000 and therefore Kimberly is entitled to reimbursement of one of that amount, or $12,500. The majority of the expenditures may have added quality of life for Kimberly and Melvin while living in the home, but there was no apparent corresponding increase in value of the property. Similarly, there is no corresponding identified separate property assets acquired by Melvin with the funds deposited in the MHR Land Services, LLC, which business generated the income and standard of living enjoyed by Kimberly and Melvin during the marriage. As such, those funds resulted in community income enjoyed during the marriage and are not separate reimbursable items. Any such claims are denied by the Court. 47 Payments on the Promissory Note from issued during the marriage has 12,500.00 been agreed by the parties to no longer be in dispute and Kimberly's reimbursement claim is valued by agreement at $12,500 48 The Missouri Camp property/Promissory Note from the Tharpes dated May 0.00 27, 2014 is asserted to originate from a $75,000 MHR Land Services, LLC check (#4813) dated July 9, 2013. There is no explanation for the difference in the $75,000 check and the $63,000 promissory note. Any loan by MHR Land Services, LLC would be an asset of MHR Land Services, LLC. There is no evidence regarding community funds being used to fund this loan. No reimbursement is owed. 49 The trailer for tractor is agreed by the parties to not be community property 0.00 50 The trailer (VIN ending with 4241) was acquired by Kimberly when she 0.00 purchased the four wheeler (VIN ending with 0124)[1]. Kimberly is entitled to retain this specific trailer. Any other trailer is to be returned to Melvin as no evidence was presented it should be considered community property. 51 The 2010 utility trailer is not in dispute and it the separate property of 0.00 Melvin. 52 The property located 6125 Bostwick Road dealt with a $210,000 loan from 0.00 Affirmed MHR Land Services, LLC and not the community assets of Melvin and Kimberly. The agreement dated May 8, 2012 amounted to a net nothing because the prerequisite of the death of either of the debtors did not occur. They subsequent conveyance by the debtors (Shipleys) to MHR Land Services, LLC amounts to the equivalent of a dation. That loan by Melvin's separate property and resolution of that debt did not create a right of reimbursement in favor of Kimberly. 53 The Bank of America Bass Pro (#1811) card is agreed by the parties to be (5,137.18) a community debt with a balance of $10,274.39 which would result in an *1145 offset of one-half of that amount against the reimbursement claim of Kimberly. 54 The Bank of America Bass Pro (#2631) card is agreed by the parties to be ($2,016.09) a community debt with a balance of $4,032.18 which would result in an offset of one-half of that amount against the reimbursement claim of Kimberly. 55 The Bank of America Bass Pro (#5541) card is agreed by the parties to be ($1,608.35) a community debt with a value of $3,261.71 which would result in an offset of one-half of that amount against the reimbursement claim of Kimberly. 56 The Pro Credit Card (#7889) is in dispute as it was converted to Acct ($3,784.70) Affirmed #6056 with a balance owed of $7,569.40 during the existence of marriage. As a community debt Kimberly would owe reimbursement for one-half of that amount. 57 The Home Depot Credit Card (#4062) has an agreed upon balance owed ($680.51) of $1,361.03 and is a community debt which would result in an offset of one-half of that amount against the reimbursement claim of Kimberly. 58 The Discover Card (#4062) has no reimbursement claims due 0.00 59 The Sears MasterCard has an has an agreed upon balance owed of ($1,353.04) $2,706.08 and is a community debt which would result in an offset of one-half of that amount against the reimbursement claim of Kimberly 60 The Attorney Fees of Rita Bacot for Kimberly in the amount of $10,401.58 $5,200.79 are agreed to be a community obligation and Kimberly is entitled to reimbursement for one-half of that community expense. 61 The Attorney Fees of Curtis Shelton for Melvin in the amount of ($1,228.47) $2,456.95 are agreed to be a community obligation and Kimberly is required to make reimbursement for one-half of that community expense 62 The Attorney Fees of Chris Broussard are not disputed 0.00 63 The Dillard's Card balance of $1,198.17. The community bank account ($599.08) would be accountable to Kimberly for any balance in that account so double credit would not be owed for this amount asserting it was paid with community funds. As such, the $1,198.17 is a community debt and Kimberly is required to make reimbursement for one-half of that community expense. 64 The Bank of America Card (#6056) is addressed in Item 55 and no 0.00 separate reimbursement is due 65 Reimbursement claim of Melvin for $189,000 paid for Kimberly's house is ($189,000.00) addressed in the "Side Letter Agreement" dated December 2, 2013 and the parties agree Melvin is entitled to reimbursement of $189,000. 66 Kimberly's mortgage payments on The Steere Drive Property is not in dispute. ($9,674.74) Amended, The parties agree Melvin is entitled to reimbursement of $9,674.74 And as Amended, Affirmed 67 Recovery of one-half of the costs of Kimberly's Breast Augmentation are 0.00 Affirmed found not to recoverable by Melvin *1146 68 Kimberly's gaming debts are not expenses for the joint benefit of the ($6,028.25) Reversed community and Kimberly owes reimbursement for one-half of the depreciation of the community estate in the form of gambling losses of $12,056.50. One-half of that amount is owed as reimbursement. 69 One-half of the payments by Melvin for the 2013 Avalanche are not 0.00 recoverable by him. The Avalanche was determined to be a community asset. That is the reason it was addressed in previous orders and was ordered to be sold at auction (until purchased by Kimberly). The purchase of the asset is a different matter than the reimbursement claim. Kimberly acquired the Avalanche for $28,000 value which resulted in a reduction of her share of the community of $14,000.[2] 70 Reimbursement Claims of Melvin for Triton Boat payments 0.00 Kimberly acquired the boat at a value of $61,000 as addressed in the November 10, 2016 Judgment and she is charged with $30,500 in reimbursement to Melvin which is addressed above. 71 The Chevy Camaro was purchased on Kimberly's birthday and specifically 0.00 titled in her name. Kimberly has satisfied the Court this vehicle was intended to be a gift for her birthday and the dates not merely a coincidence. No reimbursement claim owed by Kimberly. 72 Each party received $85,000 as an advance on the community. No 0.00 reimbursement owed as to the equal disbursements 73-77 These items of furniture have been resolved by the parties and Kimberly ($1,887.50) owes reimbursement of $1,887.50 78 Post-termination of Community Regime payments by BHP were payments 0.00 Affirmed made to Melvin's separate entity MHR Land Services, LLC, and were not disbursed or paid out during the existence of the community to him as either salary or distributions to members. Any such payments during the community would be community assets and Kimberly would be entitled to address what happened to those funds in the nature of a possible reimbursement claim. Here, however, the funds were not received during the existence of the community, were not disbursed by the separate juridical entity MHR Land Services, LLC, and therefore are not subject to reimbursement claims as community assets. No reimbursement claim due Kimberly. 79 Ford F-250 is agreed to be the separate property of Melvin 0.00 80 2015 Chevy Silverado (VIN 4731) is agreed to be the separate property of 0.00 Melvin 81 2015 Chevy Silverado (VIN 1017) is agreed to be the separate property of 0.00 Melvin 82 2006 Harley Davidson motorcycle is agreed to be the separate property of 0.00 Melvin *1147 83 Silverleaf Timeshares are agreed to be the separate property of Melvin. 0.00 TOTAL REIMBURSEMENT CLAIM OF KIMBERLY (12,500.00)
Kimberly and the Estate of Melvin have benefited equally from the disbursement and division of One Hundred Seventy Thousand ($170,000) Dollars which was equally split between them. As there was equal distribution of that community asset cash there is no need to account for it above. Kimberly has received $85,000 in cash and taken ownership of approximately $114,000 in movables - of which she already owned one-half. I addition to the $85,000 in cash she also has possession and ownership of those moveables in which her community interest was $57,240.95 for a total of $142,240.95.Considering the above, Kimberly owes Melvin's estate reimbursement of $12,500. Reversed
Rendered and signed in Benton, Bossier Parish, Louisiana this 31 day of August, 2017.
JEFF R. THOMPSON DISTRICT JUDGE
PLEASE SERVE ALL PARTIES THROUGH THEIR COUNSEL OF RECORD
APPLICATION FOR REHEARING
Before Brown, Williams, Pitman, Stone, and McCallum, JJ.
Rehearing denied.
APPLICATION FOR REHEARING
Before Brown, Williams, Pitman, Stone, and McCallum, JJ.
Rehearing denied.

No. 52,080 is Ms. Reagan's petition for divorce and petition for partition of the community property. No. 52,081 is the succession proceeding related to Mr. Reagan's estate. The trial judge signed a joint order to consolidate the cases on August 22, 2016.

Louisiana Code of Civil Procedure art. 1918 provides that a final judgment shall be identified as such by appropriate language. When written reasons for judgment are assigned, they shall be set out in an opinion separate from the judgment.

The issues here use the same numbering system for the specific assets and obligations that the trial court used in its written reasons for judgment. Both parties use that numbering system in their briefs submitted to this Court.

La. C.C. arts. 2369.1 -2369.8

Act 197 of the 2017 Louisiana legislative session altered article 2369.3 to remove both the definition of a community enterprise and to eliminate the language specifically mentioning community enterprises. That revision was not meant to change the law. Act 197 removed the singling out of the community enterprise in an effort to make clear the breadth of article 2369.3. See Andrea Beauchamp Carrol & Richard D. Moreno, Matrimonial Regimes , § 7:20, in 16 Louisiana Civil Law Treatise (4th ed. 2013). Here, the updated language of article 2369.3 is used.

See 26 U.S.C. § 408.